on behalf of the appellant Edward Joyce I represent Roger Sessions and James Arnold who are the trustees of the Sessions Family Trust and Robert Roger Sessions who's the trustee of a Robert Sessions Revocable Trust. I'd like to reserve five minutes if I could for my rebuttal. Good morning, Mr. Joyce. Good morning. This appeal relates to Rush University Medical Center's attempt to collect a judgment Rush obtained against the Estate of Robert Sessions from the assets of two trusts Mr. Sessions established before his death. Mr. Sessions died in 2005. Mr. Joyce, I think you're probably familiar with the first appeal in this case as Justice Cahill and I are and I'm sure Justice McBride is as well. Justice Cahill wrote the decision. I was a member of that panel that was in that case that was decided in December of 2007. I understand that it was a summary order and that's why perhaps it wasn't fully set out in the party's briefs but it is nonetheless I think relevant to this appeal. But with that in mind you can proceed. Thank you. I am aware of that decision. In any event, the first of the two trusts was established in 1994. Rush attempted to collect the judgment it obtained which was approved by this court by filing various causes of action against those trusts. At a fairly early stage of the trust litigation, before discovery had been completed, and importantly before any evidence had been presented to the trial court, during oral argument on cross motions for summary judgment where there was no issue involving fraud or intent to defraud, the trial court made intemperate and unfounded comments that the judgment had not been completed. The decedent settlor never intended to honor a pledge he made to Rush and the decedent intended to defraud Rush. All right. Right there, Mr. Joyce. That's where you need to stop. And I think that's where the relevance of our summary order comes into play because in that summary order I think we made clear and I think the estate also made clear and I'm quoting from the summary order, the estate responded that Rush was not entitled to the pledge because Sessions intentionally had deleted the provisions of the Now intentionally is the position that the estate took, that Mr. Sessions' actions were intentional. And I think, if anything, Judge Buszynski was not only accurate in his statement but may have been bound by the mandate of this court when we affirmed that in fact Mr. Sessions was intentional. Now, I'm not sure whether you're trying to finally divide intentional actions versus fraudulent actions. I'm not sure. Perhaps that's what you could respond to. But I have to say that I don't find any basis to call into question Judge Buszynski's comments regarding Mr. Sessions' at the very least clear aim of his argument. And I don't find any basis to call into question Judge Buszynski's comments regarding Mr. Sessions' at the very least clear aim of frustrating his, or not fulfilling the promise that he made and the promise that we said the estate was bound to uphold under the terms of that agreement. Respectfully, Your Honor, I disagree with some of what you said. There's no question that Mr. Sessions, after February 2005, concluded that he did not want to honor his pledge. Would that be an intentional decision on his part? I believe it would be. Would that in a certain – could that be characterized as being – I'm not sure fraudulent is the correct – in fact, I don't know that Judge Buszynski ever said fraudulent. He did. Actually, I'll give you the quotes. Please. But significantly, Your Honor, the trust that was established by Mr. Sessions after he concluded that he did not want to honor his pledge was a trust that was included in the assets of the estate. So no attempt was made to hide those assets from the estate. They were there and will be available to pay bills of the estate. I thought, though, that at some point the estate – at the time he died there was really nothing in the estate and that the trust ended up paying federal estate taxes. Did they not? Well, yes, the trust advanced the money to the estate. Because the estate didn't have any money to pay any bills. The estate had a significant amount of money, but nowhere near enough money to pay a $5 million federal income tax. But the estate did have significant funds. Did it have enough to pay the $1.5 million pledge? It did not. All right. You know what? I know you're going to get into the statements that the judge made. They consist of a short colloquy, do they not? Well, Your Honor, actually I summarized them this morning. And you agree? At page 12 of the appendix, quote, he never intended to pay the pledge. Never. Do you dispute that accuracy of that statement? Absolutely I do. Because never means starting – he made the pledge in 1995. Is this what Judge Budzinski said? Yes. He never intended – all right. Yes, Your Honor. But Judge Garcia has already been over the summary order where this Court stated that there was no intent to pay. So I don't know why – And the estate itself acknowledges that. Let's get to the other comments that you're really – Well, Your Honor, I think the fact that he said he never intended would go back to 1995 as opposed to 2005. All right. Are you drawing a distinction between never intending and changing your intention? Absolutely. And you think that's still an open question? It's an open – well, it's an open question that was never really addressed through evidence as to whether or not Mr. Sessions in 1994 when he funded – Why didn't the summary order foreclose that question? Because the summary order only dealt with the issue of did the estate owe Rush $1.5 million? And, in fact, it did. And did the estate's defense of medical malpractice give it any defense not paying it? It did not. Then, Mr. Joyce, here's my question to you. Yes, sir. Given that the estate – Mr. Sessions was bound to fulfill his promise, which he had to fulfill during his lifetime or upon his death. And upon his death, the estate filled his shoes and had to fulfill that promise. Right. How do you – how can – what avenue do you see that Rush should have taken to enforce that promise? I think Rush did all it could. So let me get this right. So you're saying that if we adopt your position in this case, that we should write an opinion that says – in effect, says – that if a person makes a promise and the appellate court finds that that promise is binding on the person as well as his estate, that in order to avoid fulfilling that promise, you can follow the procedures that were followed in this case? Well, Your Honor, I think the procedures followed in this case, if you're referring to the conduct taken by the – I'm saying that I thought we should give relief to a party that is entitled to relief, and you're saying that no relief is due to that party. Here's what I'm saying, Your Honor. The only avenue available to Rush when he realized that the estate had insufficient assets was to seek to find other available assets. Rush then focused on two assets. One was a 2005 trust, which we conceded was an estate asset and it was theirs. They then focused on a 1994 asset and said that under the Illinois common law, no fraud need be shown. That self-settled trust was fraudulent per se and Rush could have it. The problem Rush ran into is that after that gift was made into trust in 1994, Illinois adopted the Uniform Fraudulent Conveyance Act. That act sets out in Section 5A1 and 5A2 certain things you have to prove. Now, Rush alleged in its verified complaint that they could prove those things. The trust denied they could prove those things. At the time Judge Budzinski was hearing Rush's motion for summary judgment, there had been no evidence whatsoever offered to Judge Budzinski about whether the decedent in 1994 or in 1995 had insufficient assets to pay his bills or had any intent to defraud a future or current creditor. So those issues had to be resolved at a hearing. They were contested facts. So you're saying that those issues really weren't resolved in our summary order or weren't resolved in the course of that summary judgment motion that was filed and upheld by this Court in December of 2007.  What did we resolve in that case? You resolved, I think, very clearly and correctly that the estate had made a promise. I'm sorry. The estate was liable to pay Rush $1.5 million. And if it had the assets, it should pay them. Why didn't the estate pay it? Well, why didn't Mr. Session pay it? I don't know. Well, did he change his mind? I believe he changed his mind certainly on February 25th. Did he take actions consistent with that change of mind to frustrate the estate or frustrate Rush's right to be given that $1.5 million, given that they satisfied their end of the bargain? Arguably, as to a 2005 trust, he did, which is why we acknowledge that trust and its assets were part of the estate. So instead of fighting that issue, we said, look, that asset. But that wasn't enough to cover the... It was not, Your Honor. How deficient was it? I have no idea. Was any of that ever turned over? Well, Rush was the sixth in line in terms of having bills paid. There was no money left when it got to Rush. What's the answer to the question? As far as I know, Rush received nothing from the estate. All right. I want to get to the jurisdiction issue first because we have to resolve that. Now, what is your response to the suggestion that on the court's denial of your motion for summary judgment on count three that we have no jurisdiction? Count two. I thought it was count... Which one is it? Okay, count two because I misspoke. I don't think I've ever raised a jurisdiction issue. No, they have. They're suggesting that we don't have jurisdiction to review your complaint that the court erroneously denied summary judgment. And I'm not going to argue that to this court. Right, so you're conceding it. I'm conceding it. All right. Okay. Now, I'd like to go back to what happened... Judge Budzinski's comments. Right. And I'm going back to the October hearing where the only issue was whether or not Illinois law that existed before the adoption of the Uniform Fraud and Conveyance Act would control and whether Section 5A1 and 5A2 would be ignored. Mr. Joyce, because time is running short and you've reserved part of your time, let me see if I can rephrase your position here. You're saying that Russia's remedy can only proceed through that Illinois Uniform Fraudulent Transfer Act. I believe that's correct. And because they did not... Well, and they may have raised it in the course of their complaint. They did. But there's a question of fact, or there's a need to resolve the intent of the seat... Right. ...to allow Judge Budzinski to resolve that issue. Correct. Not only his intent, but also whether he had sufficient assets to pay bills, which he did. And this would be a question of law. No, a question of fact. Well, I meant that we can resolve this based on the record as it stands, and the comments of Judge Budzinski are clearly set forth in the record, and no one is really disputing what he said. I agree you can resolve whether... But it's a legal question that whether or not summary judgment should have been granted, and it's a de novo review. It's a de novo review, and I think based on the record there's no way it could have been granted because everyone acknowledges that none of those facts were before the court. And you understand their position that they're saying that their gravamen of their complaint is not one under that? That is correct. And they're saying that they can proceed based on common law. And you would... What's your response to that? There's absolutely no authority in Illinois to support that position, and the position they're taking, citing Crane and Miller, are directly in conflict with 5A1 and 5A2 of the Act. So you're saying that the Act pretty much supplants? The Act only supplants the common law to the extent that it is inconsistent. Inconsistent. There are many times when the common law is not inconsistent. Right. But here, where the common law would have said a transfer into a self-settled process is fraudulent per se and does not exist under 5A1 and 5A2, there are tests that must be met to determine that. So we're going to focus, or we're going to ask the appellees in a rush to address that particular question as to whether or not it is inconsistent and whether or not that Act supplanted the common law relief that they were seeking. And I'd ask you to keep all that clearly in your mind, because you'll be asked to respond to that in your rebuttal. I will. I wasn't through responding to your question about what else Judge Baczynski said that I thought should result in disqualification. Well, let me, regarding disqualification, can we give Judge Baczynski maybe some leeway in that he may have interpreted our summary order as establishing that? No. No? I don't think so. That would be unreasonable reading of our summary order? I respectfully suggest it would, because your summary order dealt with the estate as opposed to the trust. Well, it dealt with Mr. Sessions, too. It dealt with Mr. Sessions, and it dealt with what occurred in 2005. It never purported to deal with what occurred in 1994, 1995. Well, it dealt with everything that occurred up to his death. Wasn't this case pending in front of Judge Baczynski? Was he handling it from the beginning? Yes, he was. So three years he had been a participant in terms of the litigation, and he was aware of the summary order? Correct. And when the motion for substitution was filed, this was transferred to another judge? It was. And that judge reviewed that petition? He did. Denied it. Now, how are we reviewing, I believe, Judge Kennedy's denial of your motion for substitution of judge? Against the manifest weight of the evidence. Not an abuse of discretion? We're not reviewing whether it was an abuse of discretion? No, it's against the manifest weight of the evidence. And Judge Kennedy, I would point out, applied the wrong law. He misinterpreted Eichner, concluding that you could only establish the type of conduct that would disqualify a judge by pointing to extrajudicial conduct, suggesting that maybe someone had a whisper in Judge Baczynski's ear or he had to be influenced by maybe a newspaper. Here's one of the problems, Mr. Joyce, that you might, you know, it may be one of these unintentional consequences of your argument. It would pretty much, if we were to adopt your position, it might be read by the circuit courts that they should limit their discussion of the case for fear that they may say something that would create an issue on appeal that would otherwise not be created had they simply listened to the lawyers and not said anything. Well, Your Honor, I think a lively debate and a lively discussion is both invited and necessary for the question to be asked. But you think Judge Baczynski crossed the line in this? I think when he said, your client committed fraud, your client intended to defraud Rush, when that was not even an issue before him, and made no, it was clear as a bell. He had made up his mind on this issue. All right. Okay. That's very clear to us as well. Thank you. You can wrap it up, and then we'll give you time for rebuttal. I'll keep my rebuttal. All right. Thank you. Counsel. Good morning, Your Honor. Good morning. Please support John Brooks on behalf of Rush University Medical Center. You know, Judge McBride brought up that jurisdictional question, and I have a little different take on that because I've seen cases that discuss the denial of summary judgment, and they're not jurisdiction big J anyway, maybe little J, I don't know, but they're more merger cases where the issue disappears. And so I'm not sure that it's a jurisdictional question because certainly this case is before us. We have jurisdiction to, as the Supreme Court has pointed out, we can make a mistake in reaching an issue that really wasn't properly before us, but it's not a question of lack of jurisdiction, is it? Judge, we cite a number of cases. Aaron Gold is one that we rely on. You agree that the motion on count, which is the count where the court denied their motion and granted yours? That was count three. That's the main count we're here on. Wasn't that the count, though, that was specifically given 304A language? Yes, it was, Your Honor. Now the other count did not, the judge never gave that other count 304A language. That's correct, Your Honor. There are counts pending as we sit now. That's also correct, Your Honor. They're interlocutory. Yes. If you reverse the remand, they will get their day in court on those counts. And jurisdiction is not something that can be waived at any time by this court or any court. So if we lack it, we cannot proceed on a summary judgment count that was generally denied, that has no 304A language, that is not final and is not properly before this court of review. Well put, Your Honor. I'm just saying that the one count where you were denied summary judgment was given, I'm sorry, where the trust was given. Partial. Partial summary judgment. Count two. But you were granted summary judgment. That count was given the 304A language. The other count where it was denied is an interlocutory order, and I don't see how we possibly have jurisdiction. But in any event, Mr. Joyce has agreed in this oral today that he's conceding that the court lacks jurisdiction. That's certainly fine with us, and we're happy to proceed on count three, which is the main part of our case. I know there's a lot of discussion about Judge Budzinski. I expect you'd like me to comment. Do you want to go with that first? Sure. Whatever you'd like, Your Honor. Why don't you tell us whether you think the summary order that was entered in this case pretty much told Judge Budzinski that intentional act was committed by Mr. Sessions, and that intentional act can be characterized as one reaching a fraudulent. Well, I think obviously our position would be that it is. If you look at the whole exchange on that day between the bench and counsel on that issue, they get into a discussion about when that intent arose. My question is, was Judge Budzinski pretty much constrained by our summary judgment order? Or was it still an open question as Mr. Joyce argues that it really, our summary judgment order didn't say that, didn't go that far? Well, as far as intent goes, actually the intent element would only come up in count one, which was the 5A1 section of IUFTA or Uniform Fraudulent Transfer Act. No, we're still on the SOJ portion. Okay. Do you believe Judge Budzinski brought this up on his own, or did he read this, did he reach this conclusion based on what we did in the summary order? That's my question. He clearly was aware of the summary order and the finding that the conduct was intentional. Let me rephrase that. Whether he had applied it to specific counts or not yet I think is debatable. Let me rephrase that and ask you, do you read our summary order as concluding that there was an intentional act by Mr. Sessions to deprive Rush of the promise that he made? I don't have the summary order in front of me, but obviously we think that the conduct was intentional and I think Judge Budzinski read your order to say that it was. How would you summarize those comments that occurred that day? Well, I guess I'd summarize them as sort of normal and natural in the context in which they arose. This entire case is about fraud and to have a discussion with a judge three or more years into the case as to whether there's intentional conduct or fraud occurring, at one point counsel for the defendant is exchanging views with the judge as to when the intent arose and so forth. So I find them to be normal and natural. There's a presumption, of course, of Judge Budzinski's impartiality. What's the standard for an SOJ for cause? Well, this is what they call an extrajudicial source. It's not an extrajudicial source. It's 99% of those cases are under Lakey and Eichner and so forth. We get into the sort of Berger standard where even from Alcantara, from this court, very similar to this case. In Alcantara, you know, you had a counsel saying the judge is prejudging my issue because he made a comment. I think there may be a sanctions motion here. Well, you know, the standard is that remarks can be hostile or disparaging against counsel or the client or the case without rising to the level of recusal and removal of the judge. I mean, if he rules wrong, it's for appeal, not recusal. And they could be hostile but still accurate. Correct. And so I think their reliance on Barth is misplaced here. This is not a real 63 issue. Let's go on to the act and your common law relief request and whether things are consistent and whether fraudulent was still an open question that precluded summary judgment here on count three. First of all, Your Honor, there were no issues of fact here. This is cross motions for summary judgment. Okay. So both parties have agreed there's no issue of fact. Right. We move for summary judgment. And the brief doesn't claim that summary judgment was improperly granted because of material fact. Absolutely not. It's purely a question of law. So on Judge Bozinski's removal, just to backtrack one second, we don't quite understand. They say that he prejudged counts one and four. Judge Bozinski never ruled on counts one and four. Did he request an evidentiary hearing? And now he's retired. So he ruled on count three on a pure issue of law, and here we are in de novo review. So we don't see how they're damaged. I know they'd like to go back and do this all over again as an asset protection trust, and they'd like to make this keep going. It's a 2005 claim. Well, if the count that he had disposed of, if there was a prejudgment, I don't think it makes any difference that he's retired or that someone else is. No, I'm just saying if it's remanded, they will get a different judge, no matter what order you enter. But the only reason we're here is on a pure question of law on count three, cross motions on summary judgment, and de novo review from this panel. So that's, you know, I guess our comment on the removal of Judge Bozinski. But back to our main argument on count three. From the Crane case in 1925 to the Chapman case in 1998, the First District has a long history of saying self-settled spendthrift trusts are void as against existing or future creditors. Defendant's first argument that you heard from Mr. Joyce is that all the common law in this area has been preempted by IOOFTA, by the Uniform Fraudulent Transfer Act. I'll point first of all to the Savings Clause. Section 11 of IOOFTA says very clearly the common law is not preempted. In fact, it supplements the provisions of the Act. In fact, it was fraud. Well, it would already be preempted if it were inconsistent. All right, let's talk about inconsistent. I'd just like to point out the Savings Clause specifically reserves fraud. And let me just say also that there are at least five post-IOOFTA cases we cited in our briefs where there's no mention of any preemption. In fact, this court in Chapman on its 366A5 power, where no party had raised it, reached in on that child support case and said, you missed this issue. There's a self-settled spendthrift trust here. It's void as against creditors. It doesn't matter if there's a child support issue. But as to inconsistency, 5A1, yes, it requires a showing of intent, usually proved up by badges of fraud because people don't admit intent to defraud things. 5A2, more of a solvency test. Intent is irrelevant. Can you pay your bills after you've made this transfer or not? There's no – all the literature says the intent is irrelevant. So I don't think the common law of self-settled trust is inconsistent with 5A2 of the Act. In fact, it's sort of got its own solvency test. You wouldn't be looking for those assets if the person had assets to pay their bills. Here, our decedent transferred all his assets to the Cook Islands, reserves a very generous distribution standard for himself, and there wasn't even money in the estate to pay his own firm's claim that they filed. And as to Justice McBride's question as to what was in that 2005 trust, the only thing that was in it was a 1% general partnership interest that controls the rest of the money, and the only thing we could get was a charging order on it. So just to answer that question. But we don't view it as inconsistent. In fact, you know, there's a number of cases out there that say statutes will not be construed as taking away common law rights unless they're so repugnant to the statute that they strip it of its effectiveness. That's the Callahan and Reeves case. As to supplementing, we cite a couple of other cases, one involving IUFTA that's restaurant development about aiding and abetting fraud. No, the common law still survives. It's not preempted. Their second argument, I think maybe you'll hear on rebuttal, is that Mr. Sessions died and now he has no interest for us to reach it. It's an interesting argument, but we don't believe that the public policy of Illinois is that you can transfer all your assets into a self-settled spendthrift trust, pass them free of your debts to your remainder beneficiaries as long as they don't find out about the trust before you die, which is exactly what happened here to Rush. Now, this issue was addressed specifically in the Morris case where they claimed exactly the same thing. The debtor had died and they claimed, well, now there's no interest to reach. Basically, the Morris court said, you know, listen to the holy. These trusts are void as to creditors. It doesn't matter when they died and their interest does not disappear. They try to argue the restatement here in a sort of confusing fashion. I think they like it because it says creditors can reach the debtor's interest. But we all know that restatements are not the law of Illinois unless adopted by the Supreme Court. So I think we have a developed body of law on this. We cited Miller, Morris, Simon, Dexia Credit. And Dexia sort of brings me to their third argument that I'm sure you'll hear, is that we really ought to, if the common law is preempted, we ought to allow Cook Island's law to apply. Dexia Credit, as I'm sure you know, is a Northern District of Illinois case from March of 2009, almost exactly two years ago. There are a number of pieces, but that's the piece we rely on. We relied on it mostly as a choice of laws case, but happily it also involves a self-settled asset protection trust in the Bahamas, which has the same kind of debtor protection law that we have, that we're dealing with here in the Cook Islands. Which is why those trusts go there. Which is why those trusts go there. But obviously we agree with Dexia that Illinois law will recognize and give effect to foreign law as long as it's not contrary to public policy. And we don't believe it's the public policy of Illinois law to allow an Illinois decedent with Illinois assets, real estate, a business here, to transfer all those assets to a self-settled asset protection trust in the Cook Islands and defeat the rights of an Illinois creditor. So I think those are the two more arguments I think you're going to hear. All right. We'll see how well your prognostication is. What else can I answer for the court this morning? Thank you very much. I'm sorry, I believe I have time. Oh, yes, I'm sorry. There were two parties. The Attorney General's Office. Did you file a separate brief? Your Honor, we filed a motion which was granted to adopt arguments in the Rush University's brief as the charity. And that was granted, and I confirmed with the court's clerk that my joint motion or my accompanying motion to present oral argument has been approved by the court. I'm Assistant Attorney General Richard Huzzack. I'm representing the Attorney General as the ultimate beneficiary of all Illinois charities. Because there's a charity involved in this case, we intervene below and are party to the case. And I urge the court to affirm the circuit court's judgment for Rush University on the common law claim regarding the ineffectiveness of the self-settled trust by the settler to defeat the rights of a creditor. And that's consistent, we believe, with longstanding Illinois law. But as you've heard, part of the question is whether the Transfer Act impacted that common law relief. Let me address that. There are three issues. There's the scope and substance of Illinois common law generally. There's the issue of whether the Uniform Fraudulent Transfer Act abrogated or supplanted that common law rule. And then, of course, there's the choice of law question if UFTA did not abrogate the common law rule. Let me go to that second one. I believe opposing counsel's characterization of the issue as to whether they are inconsistent is an inappropriate characterization. And I would submit that they are not inconsistent. That the common law of trusts supplements the Fraudulent Transfer Act and is not supplanted by the Fraudulent Transfer Act. The two may both be triggered, the rights of creditors may both be triggered in one set of circumstances, as the various accounts in this case allege, but it doesn't mean that there can never be a situation where one applies but not the other or vice versa. And you can think of an example where, for example, and this gets a little bit into the self-settled trust issues, but assume that a settlor, you know, on the heels of having a major judgment entered against him by a creditor, puts into trust all of his assets, is not named as a beneficiary of the trust, has no power of appointment, no power to revoke, no control over the assets whatsoever. The trustee has no discretion to give the settlor any of that money. That's a fraudulent transfer situation. The statute kicks in. You don't, in all cases, need to prove intent. They're the two different tests that are applicable. But that's one situation in which the statutory remedy of the creditor would apply, but there would be no common law trust law provision under self-settled trust. But there's also a separate possibility, and that would be under the common law where there is a settlor who creates a self-settled trust. And the law in that regard is that it doesn't matter whether the rights of the creditors exist at the time or thereafter. And the common law is well established that it doesn't matter whether there was an intent to defeat the rights of creditors or not. It's strictly the law of trusts, the policy behind which is that a person cannot have his cake and eat it, too. Cannot play fast and loose with creditors. Cannot keep the benefit of assets but put them out of the reach of creditors. You cannot simultaneously do those things. And I find that it's interesting that this trust, I think the witness of it, Robert Gillen, is a lawyer here who has a website. And he advertises his services as asset protection trusts so that you can keep your yacht but your creditors can't get it. And that is the very policy that Illinois says you cannot implement because the legislature has created a limited number of situations and the Bankruptcy Code recognizes a limited number of situations in which a person's assets are not subject to the claims of creditors. Homestead exemption, tenancy by the entireties, those are recognized for the fundamental policies behind those laws. But this general right of somebody to say, I'm putting into this trust all of my assets so that any future creditor can never touch them but I have a power of appointment in those assets. I have the ability to receive as much as the trustee gives me because I'm a beneficiary of that trust. That's this case. And I think this is an opportunity for the court to say loud and clear, Illinois law does not approve, does not bless, and does not give effect to a trust in these circumstances regardless of whether there was any intent to defeat the rights of any creditor at the time that the trust was created or when assets were put into the trust. Are you saying, Counselor, that the law is not so clear right now? I think it's absolutely clear. And I find that the appellant trustees, the nephew and a lawyer from Florida, strain mightily to distinguish every case that's cited against them on the trust substance issue and on the choice of law issue. I think really the UFTA, although there are situations in which the common law has been applied after it took effect, there isn't a case on point. It really is a question of personal pressure as far as I can tell throughout the country. But they strain mightily to distinguish the cases that go against them. They don't have a single case that they can cite that's authoritative that supports their position on any of those issues. The one that they purport to rely on, the Greenwich Trust Company v. Tyson case, I think has been well distinguished by the Oregon Supreme Court that said that's just an application of the general common law in this area, which is where the settler of the trust completely dispossessed himself of some of the trust assets, had no power to revoke, never had a right to receive any of those assets, then that doesn't fall within the self-settled trust rule. That's just an application of the common law, which is, it's permissible, unless there's an application of the fraudulent transfer statute, it's permissible to put in a spendthrift clause for some other beneficiary, your grandchildren or what have you, and the self-settled trust rule doesn't trump that. And in this case, it was a remainder interest where that remainder interest was fully vested, the settler had no power to revoke it, had no appointment power by will or inter viabos, as all the provisions in this trust's instrument reserved to the settler. We'll need to wrap up. And they said that the death of the settler in that case didn't change anything because it was the same before and after the Morris case, which the marriage of Chapman decision in this course approvingly cited by the First District, I think is consistent with it. The policies here are clear. I think the results should likewise be clear, unless the court has any further questions. I think the choice of law issue is also sort of a pretty straightforward on which there's plenty of supportive authority, and I thank the court for your attention and time. Thank you. Mr. Joyce. Mr. Joyce, I want to ask you here at rebuttal if it would be an accurate estimate of the comments that Judge Kuczynski made if they're realistically portrayed on page 23 of the response brief. It begins with Mr. Brooks, and I don't know. Who says it is a crane is a judicially recognized species of fraud related to self-settled trust that just also don't require a finding of intent? We believe it supplements the act. The act says self-settled trust as to creditors are void. They are per se invalid. Now, I looked up crane. Now, was that Mr. Brooks speaking? It was, Your Honor. All right, and then this is Judge Kuczynski. But if you have fraud, don't you have intent? And then you, Mr. Joyce, said, of course. And then Mr. Brooks pops in again and says under 5A.2 and crane, don't you need intent? The court says, I know. But if you have fraud, you have intent. Mr. Joyce, yes. And then Mr. Brooks again, the intent is presumed. I guess is what you're saying, Judge. The intent is presumed, and it's a conclusive presumption under the act. Is this it? Is this what we have for the complaint that Judge Kuczynski was prejudging? No, absolutely not. All right, what else was there? Well, can I give you the pages? Or can I read them to you? Sure, read them. Okay. At page 17 of the transcript, this is Judge Kuczynski speaking. He, meaning the decedent, never intended to pay the pledge, never. As all the evidence clearly shows, he did everything that is possible to avoid the payment of the pledge. No evidence was presented on any of these issues related to the 1994 trust. Again, at page 17. Is it reasonable to infer both of those things based on his failure to fulfill his promise? Not at all. All right, the page you just read from, it doesn't use the word fraud, does it? I'm not through. All right. I mean, he's got it on five pages. Again, on page 17. All of his course of actions, that's the way that you infer that he intended never to fulfill the pledge. All the course of action he took was to avoid the payment of the pledge. All right. Is there a word, but is he saying that there was fraud there? Or is he using this intentional language? Is he using the intentional language? He uses intentional language, but he also says fraud, if I can get to it. Oh, okay. At page 22 and 23. Isn't that what the evidence shows? There was no evidence. His intention completely was to avoid the payment of the pledge. That was his intent. The court is going to rule that it was his intent, the decedent's intent, to not fulfill his pledge. He did everything to avoid the payment. At page 23. He took every step to avoid the payment of the pledge. At page 26. He took every action to avoid the payment of the claim, which was valid, and he knew it. And he had a moral obligation to fulfill it. He did everything possible to avoid payment of the pledge. I think the evidence is clear. Remember, we're talking in this before him about a 1994 trust, not about 2005. Continuing on. Page 29. I think the intent to delay and hinder and defraud is part of that count, referring to count 3. At page 38 and 38. So he's asking a question, is he not? Isn't he asking the lawyers, is part of this? He did ask that question. All right. Now, does the court have the right to ask whether an intent to defraud is part of this count 3? Very definitely. It's a very appropriate question. Okay. So from that, that's the first defraud I've heard. Well, here's the next defraud. I'm sorry. At page 38 and 39. He even went so far as to defraud the hospital by transferring all of his assets into trusts so they could not be reached by the hospital. We're not talking about a 1994 transfer. Does he say 1994? Is he talking about 2005, or do we know what he's talking about? He's talking about trusts, two trusts. One was established in 94 and one in 05, which we conceded was part of the estate. Well, that first section, you would agree that it could be interpreted as the court asking the lawyers whether or not an intent to defraud is involved in count 3. The one question he asked, very definitely. All right. Well, if he's asking about that, then there's some question, is there not, that the court may have? I don't think so because you started out by asking questions about page 23 of the respondent's brief, and I thought those questions were something that never should have brought to the court's attention. It's clear he's talking about fraud. Okay. This other discussion, though, that was highlighted. Can I read one more? All right. Okay. Again, at page 39. It's not only the intent, but also it's defraud. Okay. All right. Well, the intent part we've discussed about as far as the summary order, but this other discussion, when you're talking about a case, when the parties are talking about Crain, do you think that when a judge is discussing a case about what it stands for, that you can pull out the word and say, but if you have a fraud, you have intent, that that means the judge has prejudged the other counts when he's simply? No. Look, I would never focus on one statement a judge made or one question a judge made during the course of an appellate. But I would refer you to the quote in our brief from Judge Layton, that you determine whether there's prejudice or impropriety from all the events that take place. No judge walks out on the bench and says, I am prejudiced against your client, and I'm going to nail him. It doesn't happen. No, but the cases that you say that when you are going to focus in on comments made during the course of proceedings, there has to be a deep-seated antagonism. Are you going to say that that's what you have from the pages here? Absolutely. All right. Let me ask you this, Mr. Joyce. Isn't the SOJ issue really a red herring, in a sense, because this is a de novo review of the entry of summary judgment on count three. We review it entirely de novo. Either there's support for the judge's ruling or there isn't, regardless of who entered it. I don't care if it's Judge Kennedy or Judge Brzezinski. It doesn't make any difference to me. On de novo review, we're going to see whether or not the summary judgment was properly entered. Yes, but if I am correct, and I believe I am on the recusal, then all orders entered by Judge Brzezinski are void. They're void, and this should have been void. I'd like to just start quickly with the Attorney General. I think he sort of proves my point. He's arguing here about people playing fast and loose with their creditors. That's the kind of evidence you would expect to be put forth regarding the 1994 trust. There was none. The money's in the 1994 trust. It's not in the 2005 trust. They have that. The Cook Island law versus Illinois law, total red herring. They're the same. We're not trying to get some special treatment from Cook Island. If they were the same, Mr. Joyce, there would probably be no reason to transfer the funds to the Cook Island because there would be no benefit to the person transferring the money. There has to be some benefit in order to put the money there as opposed to here. I've never found the benefit except that a lawyer created the trust. That's the only benefit I've ever seen. Then there's a perceived benefit, whether or not it's accurate. It's marketed. As pointed out by the Attorney General, totally inappropriately by citing the webpage. A lawyer's marketing a skill. Now, I think it's interesting. No one ever suggested, including Judge Baczynski, during the course of argument or briefing, that this court's summary order approving the judgment against the estate in any way impacted on what argument was being made for the law. That doesn't mean, though, that it's so... You're correct. You're right. But no one was focusing on that. I'm sure, though, that Judge Baczynski had reviewed that document probably more than once. I'm sure he did. I'm sure he did. The suggestion that three or four years had gone by, and Judge Baczynski therefore learned a great deal about what the intent of Mr. Session was and what the facts were, we were up in the appellate process for several years. There was limited discovery, none of which was presented to the court. So that's just not there. In terms of hostile comments by a court, I've practiced law for a long time in the county of Cook, state of Illinois, and elsewhere. Judges sometimes make intemperate comments. Sometimes they're made based on what they've seen before them in a record. That is never the reason to recuse. Here the reason for recusal is not an intemperate comment. The fact that Judge Baczynski hollered at me is irrelevant. What's relevant is he said, Your client is guilty of fraud. He intended to defraud the Rush going back to 1994. That's why he should be recused. Not because of the tone or the decibel level. Judge Baczynski's hollered at me for years. And I probably hollered back at him. Can I just wrap up by saying one thing? Did I cite a case in Illinois on all fours? I did not. Neither did they. Every case they cited was a situation where the court did conclude or could have concluded that 5A1 or 5A2 controlled. They cite the Chapman case, which is from the First District. The Chapman case at page 297, Illinois, up third, 620. They don't talk about the Uniform Transfer Act, but they make findings that are consistent with 5A1. As far as Morris and Miller go, very interesting. In Morris and Miller, their bankruptcy court decisions, where the issue was, did the trustee in bankruptcy have control of the bankrupt's life interest? And the court said, of course. Of course. But not anything else. Because the fight was over people who had remained. That's because he was alive at the time, no? No. He was alive when he filed it, which is why the trustee got the interest. And then they died in both cases. So the fight was then between the trustee, who had the life interest, and the remainder men who wanted it all. And the trustee prevailed on the life interest. I just would ask, Your Honor, to consider the canons for disqualification. And the focus is on whether or not a reasonable person would assume that the comments made by the court demonstrate impartiality. And, again, the canons make it very clear that if a judge has a personal bias or prejudice concerning a party. You understand the difficulty, Mr. Joyce, of asking us to find such intemperate comments when the judge rules on a summary judgment motion without making any findings of fact. And findings of fact are oftentimes where a bias can reveal itself  But when there are no findings of fact, as you have repeatedly stated, it makes it very, very difficult for us to say that bias was present. Your Honor, I agree with you completely. It would have been much easier had Judge Kuczynski put bias in findings of fact. But he put his bias on the record, which Your Honor has. All right. Thank you very much. Thank you. The case will be taken under advisory.